**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DEKALB COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CONTRALADORA VUELA COMPAÑIA DE AVIACIÓN, S.A.B. de C.V., ENRIQUE BELTRANENA, FERNANDO SUARÉZ, GILBERTO PEREZALONSO CIFUENTES, PEDRO CARLOS ASPE ARMELLA, BRIAN H. FRANKE, WILLIAM A. FRANKE, DEUTSCHE BANK SECURITIES INC., MORGAN STANLEY & CO. LLC and UBS SECURITIES LLC,<br><br>Defendants. | X<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>X | Civil Action No. 15-CV-01337-WHP |

**CLASS ACTION COMPLAINT**

Lead Plaintiff, the Pavers and Road Builders Pension Fund ("Lead Plaintiff"), hereby brings this Complaint for violation of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and o, against Contraladora Vuela Compañia de Aviación, S.A.B. de C.V (Volaris Aviation Holding Company) (hereinafter referred to as "Volaris" or the "Company"); Enrique Beltranena ("Beltranena"), the Company's Chief Executive Officer ("CEO"); Fernando Suaréz ("Suaréz"), the Company's Chief Financial Officer ("CFO") and Chief Administrative Officer ("CAO"); the 14 individual signatories to the Company's September 18 international initial public offering ("IPO" as described below) and the seven investment banks that served as underwriters. Lead Plaintiff's allegations against Defendants (defined below) are based on personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of their counsel, which included, among other things: (i) review and analysis of Volaris' public filings with the U.S. Securities and Exchange Commission ("SEC") and certain international financial agencies; (ii) review and analysis of industry and Volaris' analyst reports and other publicly-available materials concerning Volaris' business practices and revenue recognition policies; and (iii) review and analysis of other publicly-available information concerning Volaris. The allegations set forth in this Consolidated Class Action Complaint (the "Complaint") are based on the investigation undertaken by Lead Counsel on behalf of Lead Plaintiff. Lead Plaintiff believes that substantial additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Lead Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of Lead Plaintiff and a proposed class of purchasers of 226,469,000 Volaris Ordinary Participation Certificates ("CPOs") in the form of American Depository Shares ("ADS") during the period September 18, 2013 and February 26, 2014, inclusive (the "Class Period") pursuant or traceable to the Registration Statement and Prospectus (together, the "Offering Documents") filed in connection with the Company's IPO. The 226,469,000 CPOs issued in the IPO consisted of 132,191,950 CPOs issued by the Company and 94,277,050 CPOs issued by certain selling shareholders.[1] Lead Plaintiff seeks remedies under Sections 11 and 15 of the Securities Act. Defendants made a series of materially false and misleading statements and omissions in the Offering Documents issued in connection with the IPO.

2. Volaris is an "ultra-low-cost carrier" airline (a "ULCC") based in Mexico offering more than 80 flights throughout Mexico and ten U.S. cities "that are home to some of the most populous Mexican communities based on data from the Pew Hispanic Research Center." By "unbundling" services that were traditionally offered as part of the total fare, like baggage fees or advanced seat selection, Volaris was able to provide inexpensive airfare for Mexican customers that had previously favored bus travel.

3. In 2012, Volaris reported revenues of $897.3 million USD ($11,686.4 million MXN). Of that total, $115.9 million USD, or 13% was attributable to non-ticket revenue. In the six months ended, June 30, 2013, non-ticket revenue ($71.47 million USD) accounted for 15% of Volaris' total revenue ($468.15 million USD) for that same six month period.

[1] The Registration Statement also covered an offering of 48,884,960 and 21,107,580 Series A shares of common stock issued by Volaris and certain selling shareholders, respectively, in Mexico. The Mexican offering was conducted through separate underwriters with a Spanish-language Mexican Prospectus.

4. On June 6, 2013, Volaris filed a Registration Statement on Form F-1 in connection with the sale of the 226,469,000 Volaris CPOs in the form of ADSs in the United States and other markets outside Mexico. Each ADS represented ten CPOs.

5. On September 17, 2013, after six amendments filed on Form F-1/A by Volaris in response to SEC comments, the SEC declared the Company's Registration Statement effective and on or about the same day, Volaris, through the Underwriter Defendants (defined below at ¶ 39), began selling Volaris ADSs at $12.00 USD for a gross return of more than $271 million USD.

6. At the time of the IPO, market analysts recognized the importance of Volaris' non-ticket revenue as a primary source of Volaris' growth strategy. Morgan Stanley, in initiating coverage with an "overweight" rating on November 4, 2013, stated that "we expect Mexican ultra-low-cost carrier Volaris to deliver strong results, … driven by non-ticket revenue expansion and capacity growth..." Eduardo S. Cuoto et al., *First Ultra Low-Cost Carrier in LatAm; Initiate at Overweight*, Morgan Stanley (Nov. 4, 2013). Similarly, Deutsche Bank, initiating coverage with a "Buy" rating stated, "[w]e believe that Volaris has room to grow this portion of its business over time given that more mature US ULCCs generate 30% - 40% of their total revenues via ancillary or non-ticket revenue." Michael Linenberg, *Stimulating profitable growth via low fares and the lowest costs*, Deutsche Bank (Oct. 30, 2013).

7. At the same time as the IPO, Volaris was in the process of moving to a new reservation management system called Navitaire. As a result of their senior executive positions with the Company, both Defendants Beltranena and Suárez were aware of Navitaire and its effect on the Company's operations. As Defendant Beltranena stated in October 2013 on the Company's third quarter 2013 Earnings call, "it is important to say that we successfully migrated

to our new reservation system Navitaire, yes with a delay in implementation but without any adverse operational impact. This is clearly the platform to further develop our non-ticket revenues." Volaris 3Q 2013 Earnings Call Transcript, Bloomberg, at 3 (Oct. 29, 2013). By virtue of their positions as CEO and CFO of Volaris, and their involvement in taking the Company public, Defendants Suárez and Beltranena were aware of the Company's revenue recognition policy and practices.

8. Yet, negligently, and unbeknownst to the market, the Offering Documents contained materially false and misleading statements regarding the revenue recognition policy and the failure of Volaris to comply with that policy. The Offering Documents falsely represented that the Company's revenue recognition policy required ancillary revenue, such as checked-bag fees and seat selections to be recognized at the time of flight, when in reality, the existing reservation system employed at Volaris did not allow the Company to recognize ancillary revenue after the time of sale.

9. This fact was confirmed on February 26, 2014, during the Company's conference call with securities analysts discussing Volaris' fourth quarter and full year 2013 financial results (the "February 26, 2014 Conference Call'). At that time, among other things, Defendant Suárez, Volaris' CFO, told investors that, as a result of this new reservation system there would in fact be an adverse operational impact. Volaris would now finally be able to recognize "certain ancillaries like excess baggage and special services at the time of flight [but that] prior to this, [Volaris] ha[d] to recognize ancillary revenues at the time of sale." Volaris FY 2013 Earnings Call Transcript, Bloomberg, at 3 (Feb. 26, 2014). As a result of the change in Volaris' revenue recognition, the Company was forced to reduce its non-ticket revenue results for the fourth

quarter of 2013 by $48 million MXN, or $3.624 million USD. This reduction represented more than 10% of Volaris' total non-ticket revenue for the fourth quarter of 2013.

10. The market reacted swiftly and dramatically to disclosures made during the February 26, 2014 Conference call including, importantly, to the admissions that at the time of the IPO, Volaris did not in fact comply with its stated revenue recognition policy and that, as a result of this, a $3.6 million USD revenue reduction was needed to reflect the Company's true financial condition. In response to these disclosures on February 26, 2014, Volaris ADS closed at $9.90 USD, down 17.5% from its IPO price and a one-day drop of $1.49 USD, or 13.1% on volume of 3.96 million shares, more nine times the average daily trading volume during the Class Period of 438,720 shares.

## JURISDICTION AND VENUE

11. The federal securities claims asserted herein arise under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. Sections 77k and 77o.

12. This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. Sections 1331 and 1337, Section 27 of the Exchange Act and Section 22 of the Securities Act.

13. Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act of 1934, Section 22 of the Securities Act and 28 U.S.C. Section 1391(b), given that many of the acts and practices complained of herein occurred in this district, the ADSs are listed on the New York Stock Exchange and several of the Defendants reside within this district.

## PARTIES AND RELEVANT NON-PARTIES

14. During the Class Period, Lead Plaintiff purchased ADSs of Volaris, as set forth in Schedule A, during the 180-day lockup period that extended from the date of the IPO through

March 16, 2014. As a result, Lead Plaintiff purchased ADSs of Volaris that were traceable to the IPO. During this time, only ADSs registered in the IPO were sold to the public. As a result, all ADSs purchased during this time were sold pursuant and traceable to the IPO.

15. Defendant Volaris issued 132,191,950 CPOs in the form of ADS in the IPO on September 18, 2013. The Registration Statement and Prospectus for the IPO contained false and misleading statements and omitted information necessary to make the statements not misleading.

16. Defendant Roberto Perezalonso Cifuentes ("Cifuentes") serves as Chairman of the Board of Volaris. Cifuentes signed the false and misleading Registration Statement.

17. Defendant Pedro Carlos Aspe Armella ("Armella") serves as a director of Volaris. Armella signed the false and misleading Registration Statement.

18. Defendant Brian H. Franke ("B. Franke") serves as a director of Volaris. B. Franke signed the false and misleading Registration Statement.

19. Defendant William A. Franke ("W. Franke") serves as a director of Volaris. W. Franke signed the false and misleading Registration Statement. W. Franke was also a Selling Shareholder, sold 20,833,336 Series A shares underlying the CPOs that were issued in the IPO.

20. Defendant Harry F. Krensky ("Krensky") serves as a director of Volaris. Krensky signed the false and misleading Registration Statement.

21. Defendant Roberto José Kriete Ávila ("Ávila") serves as a director of Volaris. Ávila signed the false and misleading Registration Statement.

22. Defendant Rodolfo Montemayor Garza ("Garza") serves as a director of Volaris. Garza signed the false and misleading Registration Statement.

23. Defendant Jorge Antonio Vargas Diez Barroso ("Barroso") serves as a director of Volaris. Barroso signed the false and misleading Registration Statement.

24. Defendant José Luis Fernández Fernández ("Fernández") serves as an independent director of Volaris. Fernandez signed the false and misleading Registration Statement.

25. Defendant Joaquín Alberto Palomo Déneke ("Déneke") serves as an independent director of Volaris. Déneke signed the false and misleading Registration Statement.

26. Defendant John A. Slowik ("Slowik") serves as an independent director of Volaris. Slowik signed the false and misleading Registration Statement.

27. Defendant Donald Puglisi ("Puglisi") serves as the Authorized U.S. Representative of Volaris. Puglisi signed the false and misleading Registration Statement.

28. Defendant Enrique Beltranena ("Beltranena") serves as President and Chief Executive Officer of Volaris. Beltranena signed the false and misleading Registration Statement.

29. Defendant Fernando Suárez ("Suárez") serves as Chief Financial Officer and Chief Administrative Officer of Volaris. Suárez signed the false and misleading Registration Statement.

30. Together, Defendants Cifuentes, Armella, B. Franke, W. Franke, Krensky, Ávila, Garza, Barroso, Fernández, Déneke, Slowik, Puglisi, Beltranena and Suárez are referred to as the "Individual Defendants." The Individual Defendants, along with Volaris, are referred to as "Volaris Defendants."

31. The "Selling Shareholders" as used herein, refers to Blue Sky Investments, S.A.R.L, Discovery Air and funds managed by Discovery Americas, funds managed by Indigo Partners LLC, Defendant W. Franke, Emilio Diez Barroso Azcárraga, Ignacio Guerra Pellagaud, Maria Eugenia Braña Escalera and Banco Invex S.A., and certain other executive officers and directors not otherwise disclosed in the Prospectus. Together, the Selling Shareholders offered

94,277,050 CPOs in the IPO pursuant or traceable to the false and misleading Offering Documents.

32. Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") provides investment banking products and services. Morgan Stanley acted as an international underwriter for Volaris' IPO, helping to draft and disseminate the Offering Documents. Morgan Stanley agreed to, and did, serve as a representative of the international underwriters for the IPO. As part of the IPO, Morgan Stanley purchased 5,510,149 ADSs from Volaris for sale to investors.

33. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is the U.S. investment banking and securities arm of Deutsche Bank AG. Deutsche Bank provides investment banking products and services. Deutsche Bank acted as an international underwriter for Volaris' IPO, helping to draft and disseminate the Offering Documents. Deutsche Bank agreed to, and did, serve as a representative of the international underwriters for the IPO. As part of the IPO, Deutsche Bank purchased 5,481,303 ADSs from Volaris for sale to investors.

34. Defendant UBS Securities LLC ("UBS") provides investment banking products and services. UBS acted as an international underwriter for Volaris' IPO, helping to draft and disseminate the Offering Documents. UBS agreed to, and did, serve as a representative of the international underwriters for the IPO. As part of the IPO, UBS purchased 5,481,303 ADSs from Volaris for sale to investors.

35. Defendant Barclays Capital Inc. ("Barclays") provides investment banking products and services. Barclays acted as an international underwriter for Volaris' IPO, helping to draft and disseminate the Offering Documents. As part of the IPO, Barclays purchased 1,730,769 ADSs from Volaris for sale to investors.

36. Defendant Cowen and Company, LLC ("Cowen") provides investment banking products and services. Cowen acted as an international underwriter for Volaris' IPO, helping to draft and disseminate the Offering Documents. As part of the IPO, Cowen purchased 1,153,846 ADSs from Volaris for sale to investors.

37. Defendant Evercore Group L.L.C. ("Evercore") provides investment banking products and services. Evercore acted as an international underwriter for Volaris' IPO, helping to draft and disseminate the Offering Documents. As part of the IPO, Evercore purchased 923,611 ADSs from Volaris for sale to investors.

38. Defendant Santander Investment Securities Inc. ("Santander") provides investment banking products and services. Santander acted as an international underwriter for Volaris' IPO, helping to draft and disseminate the Offering Documents. As part of the IPO, Santander purchased 2,365,918 ADSs from Volaris for sale to investors.

39. Together, Defendants Morgan Stanley, Deutsche Bank, UBS, Barclays, Cowen, Evercore and Santander are referred to as the "Underwriter Defendants."

40. Volaris is strictly liable for the false and misleading statements in the Offering Documents. The Individual Defendants signed the Registration Statement and failed to conduct a reasonable investigation that would have alerted them to the misleading nature of the stated revenue recognition policy at the time of the IPO.

41. Furthermore, by virtue of their positions as CEO and CFO of Volaris, and involvement in the IPO, Defendants Beltranena and Suárez are liable as control persons under Section 15 of the Securities Act for Volaris' violations of the Securities Act.

42. In addition, the Underwriter Defendants drafted and disseminated the Offering Documents directly and through their affiliates in connection with the IPO and were paid

approximately $4,076,442 USD (or $0.18 USD per ADS) in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

### A. Volaris Markets Itself as an "Ultra-Low-Cost" Airline

43. Volaris is a ULCC that offers domestic flights within Mexico and flights to and from the United States. As stated on its website, "Volaris offers cheap plan tickets to develop the market, offering customers quality service and a vast choice of products."

44. The Company started in 2003 as a joint venture between Discovery Americas I and Columbia Equity Partners who both invested in TACA Airlines. The Company started offering flights in 2006. That same year, Volaris was awarded $40 million USD in funding from the World Bank's Latin American arm.

45. As the Company prepared to go public, Volaris sought to differentiate itself from other major Mexican airlines such as Aeromexico by offering "unbundled" services, a strategy that allowed passengers to purchase low-cost airfare and separately purchase ancillary products (such as the ability to pick a seat in advance, pay for additional baggage, or the ability to change the name on a reservation), if they preferred.

46. Morgan Stanley, in initiating analyst coverage of Volaris on November 4, 2013, referred to Volaris as the "first Latin American airline with a ULCC business model." Morgan Stanley also relied on the Company's "superior growth and margins, driven by its unbundled fares and low cost operation" in rating it as "overweight." Eduardo Cuoto, Morgan Stanley, *First Ultra Low-Cost Carrier in LatAm; Initiate at Overweight*, VOLARIS, at 1 (Nov. 4, 2013).

47. In the weeks after the IPO, during Volaris' third quarter 2013 Earnings Call, Volaris informed investors that it was in the process of changing to a new reservation management system. The system which was a major initiative at the Company and, as Defendants Beltranena and Suárez were aware by virtue of their positions as CEO and CFO of Volaris, was intended to "further develop[] our ancillary strategy." Defendant Beltranena, Volaris' CEO, reassured the market that the implementation of this new system was done "without any adverse operational impact." Volaris Third Quarter 2013 Earnings Call, Bloomberg, at 2 (Oct. 29, 2013).

48. During this call with investors, no mention was made of the fact that one of the important purposes of the new reservation system was to bring its revenue recognition practices in line with the Company's revenue recognition policy that had previously been stated in the Offering Documents, and thus as previously represented to investors.

**B. The Offering Documents Tout Volaris' Ancillary Revenue Streams**

49. As a ULCC, non-ticket revenue was a critical driver of revenue for Volaris' business model. In 2012, the year before the Company went public, Volaris touted a 44% increase in non-ticket revenue from 9% in 2011 to 13% in 2012 and 15% in the first six months of 2013. F-1/A, at 56. As of the IPO, analysts all looked to the Company's ancillary revenue stream as a major source of growth or "upside" for the Company.

50. On October 30, 2013, Michael Linenberg of Deutsche Bank Markets Research, in issuing a "Buy" recommendation, cited Volaris' ancillary revenue stream as an important part of the Company's ultra-low-cost business model, stating that "Volaris has room to grow this portion of its business over time given that more mature US ULCCs generate 30% - 40% of their total

revenues via ancillary or non-ticket revenue." Michael Linenberg, et al., *Stimulating Profitable Growth Via Low Fares and the Lowest Costs*, Deutsche Bank, at 3 (Oct. 30, 2013).

51. On the same day, Cowen and Company gave Volaris an "Outperform" rating based, in part, on their belief that "the company has a lot of upside in terms of ancillary products." Helane Becker and Conor Cunnigham, *Initiation: The Spirit of Mexico; Rating Outperform*, Cowen and Company, at 4 (Oct. 30, 2013).

52. The Offering Documents, in identical fashion, touted the Company's ancillary revenue streams as a major source of future growth for the company. Under the heading "Our Strengths," in the Registration Statement, Volaris stated:

> We have been able to grow our non-ticket revenue by allowing our passengers to choose what additional products and services they purchase and use. ***Thanks to our "Tú Decides" ("You Decide") strategy, we have increased average non-ticket revenue per passenger flight segment from approximately U.S. $7 in 2009 to U.S. $15 in 2012*** by, among other things:
>
> - charging for excess baggage (over the 25 kilograms of free luggage required by Mexican regulations);
> - utilizing our excess aircraft belly space to transport cargo;
> - passing through all distribution-related expenses;
> - charging for advance seat selection, extra legroom, and carriage of sports equipment;
> - consistently enforcing ticketing policies, including change fees;
> - generating subscription fees from our ultra-low-fare subscription service, V-Club;
> - deriving brand-based fees from proprietary services, such as our Volaris affinity credit card program;
> - selling itinerary attachments, such as hotel and car rental reservations and airport parking, and making available trip interruption insurance commercialized by third parties, through our website; and
> - selling onboard advertising.

F-1/A, at 3 (emphasis added). *See also* Prospectus, at 3.

53. However, the Registration Statement falsely told investors that according to Volaris' revenue recognition policies, this non-ticket revenue was recognized at the time when

"***the service has been provided, which is typically the flight date.***" F-1/A, at 56. Contrary to this statement, however, non-ticket revenue was being recognized at the time of sale.

**C. The Company Reveals the Truth in the February 26, 2014 Earnings Call**

54. On February 25, 2014, Volaris released its fourth quarter and full year 2013 financial results. In that release, the Company disclosed that its total operating revenue for the fourth quarter of 2013, its first quarter as a public company, was $3.18 billion MXN ($240 million USD), down 1.1% from the fourth quarter 2012. The Company further disclosed that it had incurred a net loss of $49 million MXN ($0.48 MXN per share/ $0.03-0.07 USD per ADS).

55. The following day, on February 26, 2014, the Company held its fourth quarter and full year 2013 financial results conference call. During that call, the Company's CFO, Defendant Suárez, told the market that "as compared to the fourth quarter and full year 2012, total operating revenues per available seat mile or TRASM was 17% or 6% lower respectively." Volaris FY 2013 Earnings Call Transcript, Bloomberg, at 3 (Feb. 26, 2014).

56. Defendant Suárez explained that this drop in revenue was the result of, among other things, a new reservation system that Volaris had instituted which had affected its revenue recognition practices. He further explained that that the new reservation system would allow the Company to "***refine our revenue recognition of certain ancillaries like excess baggage and special services as the time of flight. Prior to this, we have to recognize these ancillary revenues at the time of sale. We estimate that the one-time effect of this fourth quarter 2013 was a reduction in non-ticket revenues of approximately MXN48 million, or MXN 21 per passenger, that will be revenue recognized during the course of 2014, as such services are rendered at the time of flight***." *Id.*

57. This material reduction represented a $3.6 million USD reduction in non-ticket revenue, or approximately 10% of Volaris' fourth quarter non-ticket revenue.

58. This disclosure directly contradicted false and misleading statements set forth in the Offering Documents that Volaris had, at the time of the IPO, been recognizing ancillary revenue at the time of flight purportedly in compliance with its publicly disclosed revenue recognition policy.

59. In reaction to this disclosure that, at the time of the IPO, Volaris did not comply with its stated revenue recognition policy and that, as a result of this, a $3.6 million USD revenue reduction was necessary to reflect the Company's true financial condition, Volaris ADS closed at $9.90 USD, down 17.5% from its IPO price and a one day drop of $1.49 USD, or 13.1% on volume of 3,96 million shares, much higher than Volaris' average daily trading volume during the Class Period of 438,720 shares.

60. This news was material information that contradicted investors' understanding of Volaris' previously-stated revenue recognition policy as disclosed in its IPO. Indeed, during the February 26, 2014 call, analysts Ricardo Alves of Morgan Stanley, Michael Linenberg of Deutsche Bank, and Duane Pfennigwerth of Evercore pressed Volaris for information about how this affected recognition of its prior revenue and future revenue, as well as investors' ability to evaluate year-over-year earnings – a critical criterion for assessing a company.

**THE REGISTRATION STATEMENT AND PROSPECTUS' MISSTATEMENTS**

61. The Offering Documents included a "Presentation of Financial and Other Information" which Volaris represented had been prepared "in accordance with International Financial Reporter Standards, or IFRS, including International Accounting Standard 34 [interim

financial reporting], or IAS 34, as issued by the International Accounting Standards Board, or IASB."

62. International Accounting Standard 18 states that revenue from service transactions should be recognized when: (1) it is probably that the economic benefits of the transaction will flow to the entity; (2) the revenue can be measured reliably; (3) the stage of completion can be measured reliably; and (4) the associated costs (both incurred to date and expected future costs to complete) from rendering this service are identify and can be measured reliably. IAS 18.20.

63. The "general accounting practice for passenger and freight revenue recognition is that revenue received is deferred and classified as a liability on the balance sheet until the passenger or freight is uplifted (*i.e.*, service provided), at which time revenue is recognized in profit and loss." KPMG, Recognition of Revenue in the Global Airline Industry, https://www.kpmg.com/Global/en/IssuesAndInsights/ArticlesPublications/Documents/recognition-of-revenue.pdf (last visited July 17, 2015).

64. Moreover, SEC Staff Accounting Bulletin No. 101 - Revenue Recognition in Financial Statements states that "revenue should not be recognized until it is realized or realizable and earned. SFAC No. 5, paragraph 83(b) states that 'an entity's revenue-earning activities involving delivering or producing goods, rendering services or other activities that constitute its ongoing and major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.'" Staff Accounting Bulletin No. 101, Topic 13: Revenue Recognition 17, C.F.R. Part 211.

65. In accordance with these rules and regulations, the Registration Statement in particular stated that Volaris recognized non-ticket revenue, such as "fees relating to transportation of cargo, charge flight services, excess baggage, advance seat selection [and] extra legroom…" at the time when "***the service has been provided, which is typically the flight date***." Under "Revenue Recognition," the Registration Statement stated:

> *Revenue Recognition*. Revenues from the air transportation of passengers and commissions from ground transportation services are recognized at the earlier of when the service is provided or when the non-refundable ticket expires at the date of the scheduled travel. Ticket sales for future flights are initially recognized as liabilities under the caption unearned transportation revenue and, upon provision of the corresponding transportation service or expiration of the ticket, the earned revenue is credited to operations as revenues and the liability account is reduced by the same amount. All of our tickets are non-refundable, and subject to change upon the payment of a fee. Additionally, we do not operate a frequent flier program. Non-ticket revenue includes fees relating to transportation of cargo, charter flight services, excess baggage, advance seat selection, extra legroom, carriage of sports equipment and pets, ticket changes, V-Club subscriptions, the Volaris affinity credit card and onboard advertising. ***All such revenues are collected from passengers and recognized as non-ticket revenue when the service has been provided, which is typically the flight date.***

F-1/A, at 56 (emphasis added.)

66. Identically, the Prospectus repeated the same false and misleading statement about Volaris' revenue recognition policy. *See* Prospectus, at 56.

67. These statements contained in the Offering Documents were materially false and misleading because they negligently misrepresented Volaris' revenue recognition policy at the time of the IPO, *i.e.,* that Volaris in fact recognized revenue at the time of sale, and not at the time of flight, and failed to disclose that Volaris was not recognizing revenue in accordance with the policy disclosed to investors in the Offering Documents. As Defendant Suárez stated, "with our reservation system migration we ***now*** have the tools to refine our revenue recognition of

certain ancillaries like excess baggage and special services at the time of flight. ***Prior to this, we have to recognize these certain ancillary revenues at the time of sale***." (Emphasis added).

68. As a result of the correction of this materially false and misleading statement, Volaris had to reduce its fourth quarter 2013 non-ticket revenue by $48 million MXN or $3.6 million USD, representing 10% of its non-ticket revenue for the fourth quarter 2013.

**CLASS ACTION ALLEGATIONS**

69. Plaintiff brings this action individually and as a class action pursuant to Fed. R. Civ. P. 23, *et. seq.*, on behalf of all persons and entities who acquired the ADSs of Volaris pursuant or traceable to the Company's false and misleading Registration Statement for the IPO between September 18, 2013 and February 26, 2014, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

70. This action is properly maintainable as a class action.

71. The Class is so numerous that joinder of all members is impracticable. The Underwriter Defendants sold 22,646,900 ADSs on the New York Stock Exchange in the IPO. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Volaris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72. Lead Plaintiff's claims are typical of the claims of the members of the Class and Lead Plaintiff does not have any interests adverse to the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73. Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

74. There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. Among the questions of law and fact common to the Class are:

(a) whether the Securities Act was violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public in the Registration Statement and Prospectus issued pursuant thereto misrepresented material facts about the business, operations and accounting policies of Volaris; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

75. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

76. Lead Plaintiff anticipates that there will be no difficulty in the management of this litigation.

77. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

78. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**Violations of Section 11 of the Securities Act Against All Defendants**

79. Lead Plaintiff incorporates ¶ 1-78 by reference.

80. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

81. The Offering Documents for the IPO were inaccurate and misleading and contained untrue statements of material facts.

82. Volaris is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

83. As issuer of the ADS, Volaris is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

84. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading. Had Defendants made any reasonable investigation, they would have known that Volaris' did not recognize revenue at the time of flight as their revenue recognition policy represented.

85. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

86. Lead Plaintiff acquired Volaris ADSs pursuant to the Registration Statement for the Offering.

87. Lead Plaintiff and the Class have sustained damages. The value of Volaris ADSs has declined substantially subsequent to and due to Defendants' violations.

88. At the time of their purchases of Volaris ADSs, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts before February 26, 2014. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the initial complaint was filed on February 24, 2015. Fewer than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff filed this complaint.

## SECOND CAUSE OF ACTION
## Violations of Section 15 of the Securities Act
## Against Defendant Beltranena and Suárez

89. Lead Plaintiff repeats and realleges ¶¶ 1-88 by reference.

90. This Count is brought pursuant to §15 of the Securities Act against Defendants Beltranena and Suárez, the CEO and CFO of Volaris.

91. Both Beltranena and Suárez were control persons of Volaris by virtue of their positions as senior officer and senior executive of Volaris. They were both involved in reviewing and preparing the Company's financial statements, were aware of the reservation management system change that was going on at the time of the IPO and were involved in the preparation of the Offering Documents which included the negligently false and misleading statements.

92. Defendants Beltranena and Suárez were culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff as a Class representative;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

Dated: July 20, 2015

Respectfully submitted,

COHEN MILSTEIN SELLERS
& TOLL PLLC

*/s/Christopher Lometti*
Christopher Lometti
Kenneth M. Rehns (KR-9822)
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Steven J. Toll
Daniel S. Sommers
Genevieve Fontan (GF-1906)
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

***Attorneys for Lead Plaintiff and the Proposed Class***

**CERTIFICATE OF SERVICE**

I, Kenneth M. Rehns, hereby certify that, on July 20, 2015, I caused the foregoing document to be served on counsel of record through this Court's Electronic Case Filing System.

*/s/ Kenneth M. Rehns*
Kenneth M. Rehns

# CERTIFICATION OF SECURITIES CLASS ACTION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Joe Montelle, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Administrator of the Pavers and Road Builders Pension Fund (the "Fund").

2. I have reviewed the Class Action Complaint (the "Complaint") filed in *Dekalb County Employees Retirement System v. Controladora Vuela Compañia De Aviación, S.A.B de C.V.*, Civ. No. 15-1337-WHP (S.D.N.Y.) and authorize the filing of this Certification and Lead Plaintiff Motion on behalf of the Fund.

3. The Fund is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4. During the Class Period (as defined in the Complaint), the Fund purchased and/or sold the securities that are the subject of the Complaint as set forth on the attached Schedule A.

5. The Fund did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6. The Fund has not sought to serve or has not served as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act filed during the three-year period preceding the date of my signing this Certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of April, 2015.

Joe Montelle
Funds Administrator

# SCHEDULE A

**Pavers and Road Builders Pension Fund's Transactions of American Depository Shares of Controladora Vuela Compañia De Aviación, S.A.B de C.V. (Volaris Aviation Holding Company) Cusip: 21240E105**

| Date | Purchase/Sale | Quantity | Price |
|---|---|---|---|
| 2/14/2014 | Purchase | 1,871 | $ 11.344 |
| 2/18/2014 | Purchase | 12,297 | $ 11.524 |
| 2/19/2014 | Purchase | 5,074 | $ 11.504 |
| 2/20/2014 | Purchase | 9,770 | $ 11.463 |
| 2/21/2014 | Purchase | 15,061 | $ 11.520 |
| 2/24/2014 | Purchase | 7,150 | $ 11.351 |
| 4/16/2014 | Purchase | 18,190 | $ 7.157 |
| 4/17/2014 | Purchase | 16,800 | $ 7.285 |
| 4/21/2014 | Purchase | 6,400 | $ 7.433 |
| 7/21/2014 | Sale | (4,692) | $ 8.248 |
| 7/22/2014 | Sale | (791) | $ 8.185 |
| 11/19/2014 | Sale | (87,130) | $ 8.100 |