UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

DEKALB COUNTY EMPLOYEES' RETIREMENT SYSTEM, *individually and on behalf of others similarly situated*,

Plaintiffs,

-against-

CONTROLADORA VUELA COMPAÑÍA DE AVIACIÓN, S.A.B. de C.V., *et al.*,

Defendants.

-------------------------------X

15cv1337

OPINION & ORDER

WILLIAM H. PAULEY III, District Judge:

Lead Plaintiff, the Pavers and Road Builders Pension Fund, brings this securities class action alleging that Controladora Vuela Compañía de Aviación, S.A.B. de C.V. ("Volaris") and certain participants in its September 2013 public offering violated Sections 11 and 15 of the Securities Act.[1] Defendants move to dismiss the Amended Complaint ("Am. Compl.") on the ground that the alleged misstatements were immaterial. Defendants' motion to dismiss is granted.

BACKGROUND

The allegations in the Amended Complaint are presumed true for purposes of this motion. Volaris is an "ultra-low-cost" Mexican airline that offers inexpensive flights within Mexico, and between Mexico and the United States. (Am. Compl. ¶ 2.) Volaris's business

[1] The Amended Complaint asserts claims against Volaris, its Chief Executive Officer, its Chief Financial Officer and Chief Administrative Officer, fourteen signatories to a registration statement employed in the September 2013 initial public offering ("IPO"), and seven investment banks that served as underwriters for the IPO. This Court previously dismissed claims against twelve defendants with prejudice because Lead Plaintiff acknowledged that the Section 11 claims against them were untimely. (See ECF No. 47.)

model, like that of other low-cost airlines, attracts customers by offering low "base" fares, then provides supplemental services at additional cost. (Am. Compl. ¶¶ 2, 6.) These services, called "non-ticket" or "ancillary" services, include the "transportation of cargo, char[ter] flight services, excess baggage [fees], advance seat selection, extra legroom, carriage of sports equipment and pets, ticket changes . . . [and] onboard advertising." (Am. Compl. ¶ 65.) Historically, such "non-ticket services" have accounted for nine to fifteen percent of Volaris's revenues. (Am. Compl. ¶ 49.) Some analysts predicted, however, that Volaris's non-ticket services might—some day—account for thirty to forty percent of overall revenues. (Am. Compl. ¶¶ 50–52.)

In 2013, Volaris prepared an initial public offering of American Depositary Shares ("ADS") on the New York Stock Exchange. (Am. Compl. ¶¶ 1, 13.) On September 17, 2013, after Volaris filed various amendments to its form F-1 registration statement, the SEC[2] declared the registration statement effective. (Am. Compl. ¶¶ 4–5.) On September 18, Volaris initiated its offering. (Am. Compl. ¶ 15.)

The offering documents represented that Volaris's non-ticket revenues were "collected from passengers and recognized as non-ticket revenue when the service has been provided, which is typically the flight date." (Am. Compl. ¶ 65 (quoting Declaration of David M.J. Rein ("Rein Decl."), Ex. A, at 56 n.1).) Similarly, the documents stated that Volaris complied with International Financial Reporting Standards, which provide that revenue should

---

[2] This Court takes judicial notice of Volaris's SEC filings and earnings calls, on which Lead Plaintiff relies in the Amended Complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002) (permitting consideration of documents "integral to the complaint"); Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (authorizing consideration of public SEC filings with respect to existence of misrepresentations underlying securities-fraud claim); In re Enzymotec Secs. Litig., No. 14-cv-5556, 2015 WL 8784065, at *1 n.3 (D.N.J. Dec. 7, 2009) (deeming "integral" documents "explicitly relied upon in the Amended Complaint, such as SEC filings, press releases, and earnings call transcripts").

be recognized when "the passenger or freight is uplifted (i.e., service provided)." (Am. Compl. ¶¶ 62–63.)

Around the time of the IPO, Volaris was also transitioning to an improved flight-reservation system ("Navitaire"), which the company expected to implement "no later than" September 30, 2013. (Am. Compl. ¶ 7; Rein Decl., Ex. A, at 102.) But on an October 29, 2013 earnings call, Volaris's CEO, Enrique Beltranena, reported that there had been a "delay" in transitioning to Navitaire. Beltranena stated that the system was nonetheless implemented without "adverse operational impact." (Am. Compl. ¶ 7.)

On February 25, 2014, Volaris released its Q4 2013 financials, reporting that revenue declined by 1.1%, and that it had incurred a net loss of 3.7 million dollars (49 million pesos). (Am. Compl. ¶ 54.) The next day, Volaris held a corresponding earnings call, on which CFO Fernando Suárez announced that the company had made a "one-time" deferral of 3.6 million dollars (48 million pesos) in fourth-quarter 2013 revenue into 2014. (Am. Compl. ¶ 56.) Suárez explained that the deferral was due to the implementation of Navitaire, which permitted Volaris to "refine [] revenue recognition of certain [non-ticket items] like excess baggage and special services." (Am. Compl. ¶ 56.) As a corollary, Suárez noted that the company had previously been recognizing non-ticket revenues "at the time of sale." (Am. Compl. ¶ 56; Rein Decl., Ex. E, at 3.) In essence, Suárez was acknowledging that—contrary to Volaris's offering documents—at least some portion of Volaris's non-ticket revenue was being recognized prior to the date on which the non-ticket services were provided.

On the same earnings call, Volaris representatives also disclosed a confluence of adverse events and other negative information that Lead Plaintiff does not allege, in this lawsuit, to be misleading. Specifically, the company faced a "challenging fourth quarter," including

"unexpected changes in market conditions," a "significant slowdown in the Mexican and the US economic growth," a "decline in consumer confidence due to uncertainty over tax and other reforms," "security issues," and "weather events," all of which "contributed to a weak passenger demand, driving a very low fare environment." (Rein Decl., Ex. E, at 3.) In the twenty-four hours following Volaris's bad tidings, 3.96 million shares of Volaris ADS were traded, and their value dropped by 13.1%. (Am. Compl. ¶ 10.)

Lead Plaintiff seeks to represent purchasers of Volaris ADS between September 18, 2013—the date of the initial public offering—and February 26, 2014—the date of the earnings call. Lead Plaintiff contends that the February 2014 disclosure regarding non-ticket revenues demonstrated that the September 2013 offering documents materially misstated Volaris's revenue-recognition policy. (Am. Compl. ¶ 8.)

LEGAL STANDARD

On a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." Iqbal, 556 U.S. at 679. First, a court must take the plaintiff's "factual allegations to be true and draw[] all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). However, a court must not accept allegations that are mere "legal conclusions." Iqbal, 556 U.S. at 678. Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Patterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

"[T]he heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims [only] insofar as the claims are premised on allegations of fraud." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). The court does "not . . . apply the heightened pleading standard of Rule 9(b) where the complaint sounds in negligence, rather than fraud." Hutchison v. Deutsche Bank Secs., Inc., 647 F.3d 479, 484 (2d Cir. 2011). Because Lead Plaintiff makes no allegation of fraud, this Court applies the more lenient Rule 8 standard.

DISCUSSION

Section 11 of the Securities Act encourages "compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Herman & MacLean v. Huddleston, 459 U.S. 375, 381 (1983). "[T]he statute provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties." In re Morgan Stanley Information Fund Secs. Litig., 592 F.3d 347, 358 (2d Cir. 2010); see 15 U.S.C. § 77k(a)(1)–(5). "Section 15, in turn, creates liability for individuals or entities that 'control[] any person liable' under [S]ection 11 . . . ." Morgan Stanley, 592 F.3d at 358.

In a Section 11 case, the purchaser need only plead that the alleged misstatement or omission was material. See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 120 (2d Cir. 2013). However, "the materiality hurdle remains a meaningful pleading obstacle" in Section 11 actions. In re ProShares Trust Secs. Litig., 728 F.3d 96, 102 (2d Cir. 2013). A misstatement or omission is material if, under the totality of the circumstances, "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); see Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 731 (2d Cir. 1987) (applying

Northway to Section 11 claims). "Because materiality is a mixed question of law and fact," dismissal of the complaint is only warranted if the misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009). In assessing materiality, a court "must consider both quantitative and qualitative factors." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717 (2d Cir. 2011) (internal quotation marks omitted).

I. Quantitative Factors

In recent decisions, the Second Circuit has looked to "quantitative factors" as a "good starting place for assessing the materiality of the alleged misstatement." Hutchison v. Deutsche Bank Secs., Inc., 647 F.3d 479, 487 (2d Cir. 2011). In particular, the Court of Appeals has repeatedly cited internal SEC guidance employing a "preliminary assumption" for assessing materiality based on "[t]he use of a percentage as a numerical threshold such as 5%." Hutchison, 647 F.3d at 485. In determining the applicable percentage, "[t]here is no hard and fast rule" about the "particular item" to which a financial metric should be compared. In re Ply Gem Holdings, Inc. Secs. Litig., 135 F. Supp. 3d 145, 150–52 (S.D.N.Y. 2015). Common sense, however, dictates that "the items in issue should be compared to like items on the corporate financial statement." Ganino v. Citizens Utils. Co., 228 F.3d 154, 165 (2d Cir. 2000).

Volaris argues that the alleged misstatements had "zero" quantitative effect because Volaris did not restate its revenue. Rather, when Volaris announced its Q4 2013 revenues, it deferred some of that revenue into 2014. It did not defer revenue from any quarters reflected in the September 2013 offering documents. But perhaps it should have. In February 2014, Volaris's CFO conceded that the company's booking systems had been technologically

incapable of deferring recognition of revenue for "excess baggage and special services" to a subsequent travel date. (See Am. Compl. ¶ 56.) Accordingly, it may be inferred that some revenue was prematurely recognized prior to October 2013, assuming that some customers purchased such services in an earlier financial quarter than the one in which they traveled. Courts have found that premature recognition of revenue by a growing company can be material because it "rob[s] Peter to pay Paul; accelerating the recognition of revenues into an earlier financial quarter; and therefore portraying the company's current performance as more robust than it actually was." In re Twinlab Corp. Secs. Litig., 103 F. Supp. 2d 193, 202 (E.D.N.Y. 2000) (internal quotation marks omitted).

However, Volaris points out that even if the revenue deferral was representative of deferrals that should have occurred in earlier quarters, quantitative materiality would be lacking. Volaris is right. The $3.6 million deferral would represent just 1.46% of fourth-quarter revenue and 0.36% of annual revenue, which does not even approach the numerical threshold (typically 5%) for quantitative materiality in this Circuit. See, e.g., JP Morgan, 553 F.3d at 204; Hutchison, 647 F.3d at 485; In re Duke Energy Corp. Secs. Litig., 282 F. Supp. 2d 158, 160–61 (S.D.N.Y. 2003). Although Lead Plaintiff attempts to machine these percentages, dividing the total deferral by Volaris's non-ticket revenues alone, that equation is a matter for qualitative—not quantitative—analysis. The Second Circuit has concluded that the relevant question for quantitative materiality is the effect a misstatement has on the total value of a defendant's relevant assets. See, e.g., Hutchison, 647 F.3d at 488 ("[O]ne tier in the hierarchy of . . . interests[ is] not the subject of investors' fixation. So any alleged impairment . . . must be analyzed in relation to [the] entire investment portfolio ($1.1 billion), consistent with the

quantitative approach in JP Morgan."); JP Morgan, 553 F.3d at 204 (misstatement's value compared to "total assets").

II. Qualitative Factors

A qualitative assessment is "intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large." JP Morgan, 553 F.3d at 205. Courts employ a "common-sense and holistic approach" to analyzing these factors. In re SLM Corp. Secs. Litig., No. 08-cv-1029, 2012 WL 209095, at *7 (S.D.N.Y. Jan. 24, 2012). Lead Plaintiff argues that while Volaris's misstatements may be quantitatively minor when compared to the company's revenues, the misstatements would have assumed disproportionate significance for investors because they: (1) impacted an important segment of Volaris's business; (2) interfered with Volaris's compliance with "regulatory requirements"; (3) "masked a change in earnings or other trends"; and (4) caused a decline in the stock price.

A. Significant Role in the Business

When "a particular . . . segment of a company's business[] has independent significance for investors, then even a matter material to less than all of the company's business may be material for purposes of the securities laws." Hutchison, 647 F.3d at 488. Accordingly, Lead Plaintiff argues that Volaris's revenue-recognition policy for non-ticket services was more important than its financial impact might otherwise suggest.

Here, Lead Plaintiff cannot even allege that the misstatement was "material" to the fraction of non-ticket revenues that comprise "less than all" of Volaris's business. See Hutchison, 647 F.3d at 488. Lead Plaintiff did not plead (and does not know) what, if any, percentage of Volaris's non-ticket revenues might have been affected by the misstatement. (See Feb. 19, 2016 Oral Arg. Tr., at 19–20.) The February 2014 earnings call, on which Lead

Plaintiff relies, explains that Volaris's technological blunder only affected certain subclasses of non-ticket revenue, like "excess baggage and special services." (Am. Compl. ¶ 56.) Moreover, that error would only have an effect on Volaris's quarterly revenues when a customer purchased that specific subclass of non-ticket services in a different financial quarter from the one in which he or she traveled. In other words, whenever customers simply paid for an "excess bag[]" on or near the date of travel—for example, at the gate—that revenue was recognized in the proper quarter. And even if the deferral is compared solely to Volaris's non-ticket revenue, it constitutes only 2.5% of annual non-ticket revenue, or 10.6% of quarterly non-ticket revenue. (See Pl.'s Br., at 10, 30.)

Lead Plaintiff counters that while the misstatement may seem insignificant now, non-ticket revenues will grow substantially. See Litwin, 634 F.3d at 720 ("[A] reasonable investor would almost certainly want to know information related to [a] segment that [the defendant] reasonably expects will have a material effect on its future revenues."). But materiality is determined "in light of the circumstances existing at the time the alleged misstatement occurred," not based on what could occur on some future date. Ganino, 228 F.3d at 165. Given that Volaris's revenue-recognition policy was corrected long before the hypothesized growth in non-ticket revenues, Lead Plaintiff cannot speculate about the impact the misstatement might have had if it had been left uncorrected.

B. Regulatory Requirements

Another qualitative factor is a "registrant's compliance with regulatory requirements." SLM Corp., 2012 WL 209095, at *7. Lead Plaintiff argues that this factor is satisfied because Volaris certified that it was complying with International Financial Reporting Standards ("IFRS"), which require recognition of non-ticket revenues at the time of service.

Specifically, Lead Plaintiff argues that a deviation from IFRS would be a regulatory violation, which would, in turn, suggest qualitative materiality.

However, the authority on which Lead Plaintiff relies does not support this proposition. In one cited case, a court's materiality analysis mentioned accounting violations in passing, but specifically observed that the absence of quantitative materiality allegations might have been "fatal" to the plaintiffs' claims had they not alleged a "widespread fraudulent practice" with a "huge net effect in error" on the defendant's financials. In re Computer Assocs. Class Action Secs. Litig., 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999). In another, the Ninth Circuit found on summary judgment that certain accounting violations, added to other evidence, suggested scienter (not materiality). See Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996). And in the three remaining cases, courts found that violations of SEC accounting principles suggested that misstatements existed (not that they were "material"). See Levy v. Maggiore, 48 F. Supp. 3d 428, 446–47 (E.D.N.Y. 2014); In re Campbell Soup Co. Secs. Litig., 145 F. Supp. 2d 574, 592 (D.N.J. 2001); In re Stellent, Inc. Secs. Litig., 326 F. Supp. 2d 970, 981 (D. Minn. 2004).

In sum, Lead Plaintiff has not established that any deviation from IFRS accounting standards—however miniscule—suggests materiality. This is particularly so here, where the alleged accounting violation is simply "duplicative of the other alleged misstatements" on which Lead Plaintiff relies. In re Wachovia Equity Secs. Litig., 753 F. Supp. 2d 326, 365 (S.D.N.Y. 2011). Accordingly, this factor does not alter this Court's materiality analysis.

C. Change in Earnings

Lead Plaintiff also claims that Volaris's misstatement was material because the "premature[] recogni[tion]" of a fraction of Volaris's non-ticket revenue "mask[ed] a change in earnings or other trends." See Litwin, 634 F.3d at 720. Lead Plaintiff does not explain what

"trend" was masked, other than to reiterate that Volaris was prematurely recognizing revenue from non-ticket sales. (See Pl.'s Br., at 18–19.) And Lead Plaintiff has not adequately alleged that the percentage of affected revenue could have sheltered Volaris's financials from variations due to normal market conditions.

D. Drop in Stock Price

Finally, Lead Plaintiff invites this Court to infer materiality from the fact that Volaris's stock dropped 13.1% after the earnings announcement. However, Volaris's statements regarding non-ticket revenue recognition were but one aspect of an earnings call in which Volaris conceded a host of negative, market-moving facts that Lead Plaintiff does not allege to be misleading. Specifically, Volaris disclosed that it had faced a "challenging fourth quarter . . . as a result of several unexpected changes in market conditions such as a significant slowdown in the Mexican and the US economic growth, a decline in consumer confidence due to uncertainty over tax and other reforms, the security issues and definition [sic] in the Mexico City Airport slot designation and weather events," all of which "contributed to a weak passenger market demand, driving a very low fare environment." (Rein Decl., Ex. E, at 3.) Given the array of discouraging revelations, "[c]onsideration of potential market reaction to disclosure of [this] misstatement is by itself too blunt an instrument to be depended on" in assessing materiality. Hutchison, 647 F.3d at 490. In the context of the grim earnings call, the stock drop does not suggest materiality with respect to Volaris's recognition of certain subclasses of non-ticket revenue.

III. Section 15 Claims

"To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants." Hutchison, 647 F.3d at 490 (citation omitted). Lacking a predicate Section 11 claim, Lead Plaintiff has no Section 15 claim.

IV. Dismissal with Prejudice

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave "may be denied where amendment would be futile." Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC, 797 F.3d 160, 190 (2d Cir. 2015); see Loreley, 797 F.3d at 190 ("Denial of leave might be proper where a plaintiff's request [to amend] was inconspicuous and never brought to the court's attention . . . or where the request gives no clue as to 'how the complaint's defects would be cured[]' . . . .").

In the parties' motion papers, Defendants requested dismissal with prejudice. (Defs.' Br., at 24.) In response, Lead Plaintiff neither requested that any dismissal be without prejudice, nor sought leave to further amend the Amended Complaint. (See Pl.'s Br., at 25.) Indeed, in response to this Court's inquiry as to why the alleged misstatements were material, Lead Plaintiff's counsel conceded that they "obviously c[ouldn't] quantify" the impact that Volaris's revenue deferral would have had on investors. (Feb. 19, 2016 Oral Arg. Tr., at 20; see Feb. 19, 2016 Oral Arg Tr., at 21 ("Do we know exactly what th[e] net [quantitative] effect would have been? No. As we stand here, no one in this room knows.").) Because Lead Plaintiff has neither sought further amendment of the pleadings nor identified any additional information that could suggest a finding of materiality, further amendment would be futile. See Hutchison, 647 F.3d at 490–91 ("[E]ven assuming Plaintiffs supplement their allegations with [other] facts . . . Plaintiffs' allegations fail to satisfy any of SAB No. 99's quantitative or qualitative materiality factors. Amending the Second Amended Complaint would be futile.").

CONCLUSION

Defendants' motion to dismiss is granted, and Lead Plaintiff's Section 11 and Section 15 claims are dismissed with prejudice. The Clerk of Court is directed to terminate the motion pending at ECF No. 50 and mark this case as closed.

Dated: July 6, 2016
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.